SHAHEEN ASSIF ET AL. *v.* THE ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued October 5, 1950—decided January 2, 1951

*William J. Larkin* and *William J. Larkin, 2d,* for the appellant (defendant Manufacturers' Foundry Company).

*Margaret C. Driscoll,* for the appellees (plaintiffs).

INGLIS, J. The decision of this case turns upon the question whether the unemployment for which the plaintiffs seek benefits was the result of a lockout within the meaning of that word as it is used in our Unemployment Compensation Act.

The facts found by the unemployment commissioner may be summarized as follows: The plaintiffs were employees of the Manufacturers' Foundry Company, hereinafter referred to as the company, which operated a gray iron foundry in Waterbury. Local 251 of the Industrial Union of Marine and Shipbuilding Workers of America, hereinafter referred to as the union, was the bargaining unit which negotiated with the company on behalf of its employees, and the plaintiffs were all members of the union.

Prior to July 25, 1949, the company and its employees were operating under an unsigned agreement dated July 19, 1948. By the terms of that agreement, the wages of the employees were increased by twelve cents per hour over what they had been under the pre-existing agreement. That increase had been granted upon the assurance of the union that it would request its

members to increase production. The pay of each employee was to be determined by adding wages on an hourly basis to his earnings on a piece-work basis which had been fixed in 1940. The agreement provided that if either party desired to change the wage schedule it should give written notice to the other at least sixty days prior to July 19, 1949. On or about May 12, 1949, both the union and the company gave, each to the other, notice that it desired to reopen the wage scale and other matters.

Commencing on May 26, 1949, and extending to July 22, a series of meetings was held at which representatives of the company and the union discussed revision of the wage scale and closely related matters. At most of these meetings, a federal conciliator was present. At a meeting on June 13, the company made certain definite proposals, but they were rejected by the union on June 20. Finally, on July 18, the company gave the union a revised proposal. This was, in part, that there be a reduction of twelve cents per hour in the hourly wages of all employees except patternmakers, maintenance men and cupola men; that there be a retiming of piece-work prices, to be made on the basis of the day rate of the employee involved, and after retiming the employee would receive piece rate only; that certain war-time bonuses be eliminated; and that arbitration of all disputes be by an arbitrator to be selected by the American Arbitration Association. No further explanation was given by the company as to how the retiming of piece work rates would be done, although such explanation was requested by the union and the proposal of the company on that subject was uncertain.

At that meeting, the union informed the company that it would reject any attempt by the company to reduce rates of pay and that the union had authorized

its negotiating committee to call a strike. The company then announced that the decrease in wages outlined in its proposal would become effective on Monday, July 25, 1949. The union informed the company that the day the decrease went into effect there would be a strike. On July 22, another meeting was held. At that meeting the position of the company was that it was willing to continue to negotiate but that the revised wage schedule should become effective on July 25. The purpose of the company's proposed wage revision was to obtain more production from its employees for less wages. It informed the union that this was made necessary by business and economic conditions but that it would not affect the total earnings of the employees provided they would work harder.

On July 25, the company opened its plant so that its employees could come to work at the regular starting hour of 7 o'clock in the morning. A few minutes before that hour, representatives of the union's negotiating committee inquired of the company's superintendent whether or not the wage cut would become effective that day. They were informed that it would. They thereupon established a picket line, which on the morning of July 25 carried signs stating that the employees were "on strike." In the afternoon of that day the signs were changed by substituting the words "locked out" for "on strike." This picket line was maintained continuously from July 25, 1949, at least to the date of the hearing before the commissioner on October 10, 1949. During that time the plaintiffs were willing to go to work whenever the wage cuts were restored, and the union informed the company to that effect. It is specifically found by the commissioner that at all times since July 25, 1949, the doors of the company's plant have remained open and the company has been willing to give employment to any of the plaintiffs or

its other employees who would work for the wages put into effect by the company on July 25, 1949.

On the foregoing facts, the commissioner concluded that all of the plaintiffs, including seven who by reason of the nature of their work had not been subjected to a reduction in pay, were entitled to unemployment benefits. He reasoned that the unemployment of the plaintiffs had resulted from the fact that the company issued an ultimatum laying down terms of employment which were materially worse for the employees than those previously existing, and that such action on the part of the company constituted a lockout which brought these plaintiffs within the exception to the disqualification for benefits which exists under our law when the unemployment results from a labor dispute. General Statutes § 7508 (3).

The questions of law involved in this case are identical with those in *Almada* v. *Administrator*, decided this day. The fundamental question is what is meant by the term "lockout" as it is used in § 7508 (3). In the *Almada* case we concluded that it connotes something more than "an effort on the part of the employer to deprive employees of some advantage they already possess," because in the statute that phrase is used not as a definition of the word "lockout" itself but rather to describe the kind of lockout which is effective to take a case out of the disqualification for benefits which is imposed in labor disputes. If the legislature had intended that the exception to the disqualification provisions should be unemployment resulting from nothing more than an effort on the part of an employer to deprive employees of some advantage they already possess, it could very easily have used the quoted phrase alone and not employed the word "lockout" in the statute at all. We held that a lockout, as the term is used in the statute, is a withholding of employment by

an employer in an effort to obtain for himself more advantageous terms. The withholding of employment may be accomplished by closing the plant or by telling the employees that there will be no work or by announcing that employment will continue only upon modified terms which are such that the employees could not reasonably be expected to accept them and have no reasonable alternative but to leave their work.

In the present case, there was no physical locking out of the employees. There was no order to them not to report for work. If there was a lockout at all, it was one accomplished by the employer, who, in an effort to force new conditions on its employees, imposed terms of continued employment which they could not reasonably be expected to accept. As is pointed out in the *Almada* case, the question whether terms imposed for that purpose are such that the employees could not reasonably be expected to accept them is a question of fact. It depends upon the determination of what was reasonable under all the attendant circumstances. Unless the commissioner has determined that question in the affirmative, there is no adequate support for a conclusion that there has been a lockout. The commissioner in this case did not pass upon the question. Although he found that the ultimatum issued by the company imposed terms of employment materially worse for the employees than those under which they had been working, he did not find that they were such that the employees had in reason no alternative but to refuse to accept them. He made no finding concerning the employer's purpose in announcing the new terms. Accordingly, his conclusion that there had been a lockout cannot stand.

As regards the seven plaintiffs whose wages were not reduced by the company, the administrator denied them benefits, the commissioner reversed that decision

and the Superior Court sustained the commissioner. It is difficult to see how any action of the company directed toward them could be concluded to be a lockout. Since, however, the case must be remanded for a rehearing, their rights should be determined in accordance with the principles enunciated in this opinion.

There is error, the judgment is set aside and the case is remanded for the rendition of a judgment returning it to the unemployment commissioner for a rehearing and a finding of facts and an award in accordance with this opinion.

In this opinion the other judges concurred.