WILLIAM M. BARTELL AND OTHERS v. NATIONAL VALVE AND MANUFACTURING COMPANY AND ANOTHER.

223 N. W. 2d 476.

November 15, 1974—No. 44451.

*Lampe, Fossum, Jacobson & Borene* and *Bernard E. Borene,* for relators.

*Faegre & Benson* and *Dale E. Beihoffer,* for respondent employer.

*Warren Spannaus,* Attorney General, *Jonathan H. Morgan,* Solicitor General, *Peter C. Andrews,* Assistant Attorney General, and *Gary C. Reiter,* Special Assistant Attorney General, for respondent commissioner.

PER CURIAM.

Certiorari to review a decision of the representative of the commissioner of the Department of Manpower Services holding that claimants were partially disqualified from receiving unemployment benefits.

On and prior to June 12, 1972, all of the claimants were employed by National Valve and Manufacturing Company as pipefitters and were engaged in the construction of a Northern States Power Company nuclear power plant on Prairie Island near Red Wing, Minnesota. All of the claimants were members of Pipefitters Union, Local No. 455. On June 12, 1972, the Ironworkers Union, another union whose members were involved in the construction project, went on strike against Northern States Power Company, the general contractor, and pickets were placed at the construction site. The ironworkers' strike was not against National Valve and Manufacturing Company, the employer, and neither the claimants nor their union participated in the strike. The employer had work for the claimants to perform that did not involve the ironworkers and none of the employees' supervisors in charge at the work site advised the claimants that no work was available. On June 12, 1972, the claimants reported to the construction site intending to go to work. However, the site was picketed and none of the claimants went through the picket line.

On and after June 12, 1972, individual claimants filed claims for unemployment compensation benefits. The department submitted to claimants a form headed "Information from Workers Involved in a Mass Unemployment Issue." One of the questions appearing on this form was, "Exactly what happened that caused YOU to stop work?"

The answers filed make clear that claimants were out of work simply because they refused to cross a picket line.[1]

In spite of these answers, claimants contend that it would have been fruitless to cross the picket lines because the gates were locked. However, the representative of the commissioner found that none of the claimants reported for available work. In any event, there was no "lockout." Minn. St. 179.01, subd. 9, defines lockout as "the refusal of the employer to furnish work to employees as a result of a labor dispute." In this case, no labor dispute existed between claimants and their employer, and the employer did not tell the claimants not to come to work; thus there was no "lockout" as that word is used in Minn. St. 1971, § 268.09, subd. 1(5),[2] providing that an individual is disqualified for benefits:

"If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed, except that this disqualification shall not act to deny any individual the right to benefits based on employment subsequent to his separation because of a strike or other labor dispute if such individual has in writing notified the employer involved in such strike or other labor dispute of his resignation and acceptance of his resignation and acceptance of other bona fide employment and provided further that such resignation is accepted by all parties to the strike or other labor dispute so that such individual is no longer considered an employee of such employer. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minne-

---

[1] The following are some of the answers given by the claimants: "Iron workers had the jobsite picketed"; "Strike sign; I chose not to cross the picket line"; "Pickets on the job"; "I reported to work on 6-12-72 and the jobsite was picketed so I couldn't get to work"; "Iron workers put up banner and cannot cross the banner"; "Iron workers picketed jobsite"; "I couldn't get onto the jobsite because of the picket"; "The iron works [sic] strike picket keeps all trades out"; "Iron workers started picketed [sic] jobsite"; "Picket line at the jobsite this morning that is June 12, 1972." Similar statements were made by several other claimants on other forms.

[2] The legislature amended Minn. St. 1971, § 268.09, subd. 1, in 1973, which was after these claims for unemployment compensation were filed and thus does not affect this decision.

sota labor relations act. Nothing in this subdivision shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

The commissioner's finding that the claimants did not report for available work obviously was based on their refusal to cross the picket line. In the light of their written reasons for not working, we cannot say that the finding and decision of the commissioner is unsupported by substantial evidence.

Certain benefits were awarded to claimants by the appeal tribunal. The employer appealed from that decision to the commissioner, who decided:

"On June 12, 1972, the claimants voluntarily discontinued their employment without good cause attributable to the employer; they are disqualified for benefits for five weeks of unemployment in addition to the waiting period; their maximum benefit amount is reduced by two times their weekly benefit amount and benefits paid, if any, to the claimants shall not be charged to the employer's experience rating account."

The only issue presented here is: Did the claimants voluntarily and without good cause attributable to the employer discontinue their employment with the employer?

The claimants are admittedly entitled to unemployment benefits unless they are disqualified under Minn. St. 1971, § 268.09, subd. 1, which provides in part:

"An individual shall be disqualified for benefits:

(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer * * *, for not less than five nor more than eight weeks of unemployment in addition to and following the waiting period, * * * and the maximum benefit amount payable to such individual shall be reduced as follows:

* * * * *

(b) by an amount equal to two times the weekly benefit amount, when the separation occurs because of a voluntary separation as described in this clause."

Our scope of review is limited by the Administrative Procedure Act, Minn. St. 15.0425, which does not permit us to reverse or modify a find-

ing or decision of the commissioner unless his finding or decision is unsupported by substantial evidence.

In the instant case, the representative of the commissioner found that claimants voluntarily discontinued their employment without good cause attributable to their employer. We cannot hold that such a finding is unsupported by substantial evidence in view of the entire record as submitted and therefore must affirm.

Affirmed.

SCOTT, JUSTICE (dissenting).

It appears that the representative of the commissioner disregarded the totality of evidence presented and I would, therefore, reverse the decision which partially disqualifies claimants from receiving unemployment benefits.

An appeal tribunal of the Department of Manpower Services, after taking testimony, made the following decision:

"On June 12, 1972 the claimants were involuntarily separated from their employment because of a lockout; they are not disqualified for benefits; the maximum benefit amount payable to them is not reduced because of said separation from employment; and benefits paid, if any, to the claimants shall be charged to the employer's experience rating account."

The majority opinion correctly states that "[o]n June 12, 1972, the claimants reported to the construction site intending to go to work. However, the site was picketed and none of the claimants went through picket line." Although this statement is accurate to the extent of its effect, it fails to go further in an analysis of the evidence contained in the record and considered by the appeal tribunal. When claimant Thomas D. Nelson was duly sworn, he was asked:

"Q. Could you state what you felt happened.

"A. Because the gates were locked out therefore, I was in a sense unemployed. But I did not voluntarily quit, I was not fired or nothing. They just locked the gates and that was it.

\* \* \* \* \*

"Q. Or they never did open the gates. You were around there how long?

"A. Well I stayed there considerably that morning and several days afterwards I came back just to check and they were still locked those times. Each time I came back and that gates were still locked. And in fact the last day of the strike we came back to work because there was no pickets, there was not a single picket on the job site, we all reported,

got to the gate and the gates were still locked and they refused to open the gates for us. We all had to turn around and go home and they even came out on nationwide television that night and said that they were sorry the gates were locked but they were not ready to handle the men yet. And so there, I mean when they come right out over nation * * *."

Mr. Alexander Kober also testified under like circumstances:

"A. On the 12th I went down there to go to work and I was just turned back. There was nothing to do, no place to go but just jump in your car and go home, that's all. There's no use trying to get into the plant everything was locked up.

"Q. And you noticed the pickets. You weren't asked to cross the line.

"A. I didn't even see the picket line. I was down there, there was a lot of people just around there and it was impossible for anybody to get into the plant site, so we just took it for granted we didn't have no chance.

"Q. You figured you were locked out.

"A. Oh sure I was locked out."

Bob Schiel testified:

"* * * Who ordered the gate locked I don't really know. Whether it was Northern States Power that ordered the gate locked or—just who it was. But that was the situation. Even our superintendants did not you know know what the reason was. They knew the gate was locked. A couple of the guys went down to telephone to use their phone down there and the guard let 'em in to use the phone but they couldn't go to work though."

Claimant Robert DuBois stated:

"* * * So I called National Valves office that morning, that's when I heard over the news that the strike was on and nothing was said about National Valve being on strike or picketing so I called on the phone * * *.

\* \* \* \* \*

"About eight o'clock in the morning. I don't think anybody was here before eight or not much before. And I talked to the girl in the office, I guess evidently Brian or whoever's in charge over there was busy and I asked if they were working today and she replied, no, the plant is shut down. So she said, there was no sense of coming down. And after the strike was over I also called back again and I asked when to come back to work. And they said that they had just a skeleton crew, that they weren't ready to hire the full crew back."

All the above testimony was uncontradicted and was apparently disregarded by the representative of the commissioner.

Minn. St. 1971, § 268.09, subd. 1(1), provides that an individual shall be disqualified "[i]f such individual voluntarily and without good cause attributable to the employer discontinued his employment * * *." Certainly, under these facts and circumstances the employees did not voluntarily leave their employment. It is true that they did not cross the picket line, but through no fault of their own the gates were locked and all work had ceased until the strike was over. The employer neither indicated that it would have employment for them, nor did it actually have employment for them. Any evidence before us of any contact with the employer indicates that this employer said that all work had stopped. Assuming that the employer may have also been a victim of circumstances, such a situation does not preclude the law from operating as intended. The statutory definition of the word "lockout" as the refusal of the employer to furnish work to employees as a result of a labor dispute must control. Minn. St. 179.01, subd. 9. We are faced with that type of conduct here.

The appeal tribunal's holding seems to be the only appropriate conclusion to carry out the legislative declaration that "[i]nvoluntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance." Minn. St. 268.03.

It is this substantial evidence which leads me to believe that statutory intent would be carried out by reversal.

TODD, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Scott.

MacLAUGHLIN, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Scott.

YETKA, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Scott.

MR. JUSTICE KNUTSON took no part in the consideration or decision of this case.