SUNSTAR FOODS, INC., Relator,

v.

Donna UHLENDORF, et al., Respondents,

Commissioner of Economic Security, Respondent.

No. 52001.

Supreme Court of Minnesota.

Sept. 11, 1981.

Rehearing Denied Oct. 22, 1981.

Peterson, Tews & Squires and Charles C. Jensch, St. Paul, for relator.

Peterson, Bell & Converse and David S. Anderson, St. Paul, for Uhlendorf.

Warren Spannaus, Atty. Gen., and James A. Jorgenson, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Economic Sec.

Peterson, Engberg & Peterson, Roger A. Peterson and Jay Y. Benanav, Minneapolis, for Mn. AFL–CIO.

John B. Lennes, Jr., St. Paul, for Mn. Assn. of Commerce and Industry.

WAHL, Justice.

Relator appeals the decision of the Commissioner of the Department of Economic Security finding that the relator's employees, the 60 respondents here, were separated from their employment due to a lockout. We affirm.

Sunstar Foods, Inc. (Sunstar) operated a beef-slaughtering and packing operation in South St. Paul, Minnesota. Respondents, all employees of Sunstar, were members of the United Food and Commercial Workers Union, Local 4–P (the union). The labor contract between Sunstar and the union was due to expire on October 31, 1979. On October 26, 1979, Sunstar wrote a letter to all employees explaining that its financial position was not good, that the wages paid at Sunstar were $3 per hour more than paid by competitors, and that the employer needed the help of employees in the upcoming contract negotiations to solve Sunstar's financial difficulties. On the day before expiration of the contract, the employer and the union agreed to extend the existing labor agreement until a new contract could be negotiated.

Representatives of the union and Sunstar met seven times to negotiate, beginning on October 30, 1979. The union presented a list of 23 demands of items to be included in the new contract but dropped all but six of its demands dealing with wage and benefit increases in the course of bargaining. The employer proposed contract provisions with wage reductions of $2.23 per hour, a cap on cost-of-living increases, a longer probationary period, and reductions in sick leave benefits and severance pay.

The employer made an oral agreement in the course of bargaining that there would be a real guarantee of 38 hours of work per week. The old contract had a guarantee of 36 hours, but, through the sanction of an arbitrator's decision, the employer had frequently laid off workers on Friday and recalled them on Tuesday, making the effective work week 28.8 hours. The previous experience led the employees to believe that the real guarantee of 38 hours proposed by the employer was no more "real" than was the 36-hour guarantee in the old contract, because the proposed language was identical to that in the old contract. Therefore, the decrease in wages alone meant a 21–26 percent reduction in pay for the employees in various job categories.

Though the union dropped most of its demands, the employer continued to support its proposed contract through several bargaining sessions. On January 22, 1980, the employer informed the union that the proposed contract would go into effect on February 4, 1980. The union membership voted to reject the unilaterally proposed contract on January 28, 1980, and voted to authorize a strike in the event of a negotiation stalemate. The union and the employer met again on January 31, 1980, but no agreement was reached. The union stated that the employees felt the proposed contract terms were unacceptable but the union wished to continue negotiations. The union membership met on the same day and agreed that they could not work under the new wage structure, and the union notified the employer of this decision. The usual Monday and Tuesday work schedules were posted on Friday, February 1, 1980. The employees worked on Saturday, February 2, 1980, to process all of the cattle in the plant to make sure no meat would spoil if the negotiations reached no conclusion over the weekend and they would not be working on Monday.

Picket lines were established at 12:01 a. m. on Monday, February 4, 1980. Members carried signs reading, "Strike, Unfair." Many employees joined the picket line but did not report for work. Sunstar did not purchase any cattle for processing on February 4, and no beef production had occurred at the plant up to the date of the hearing.

Respondent employees filed the necessary forms to apply for unemployment compensation benefits. Some reported their reason for failing to work as "strike," while others reported "$2.23 cut in pay." Some reported that their regular jobs were not available, while others reported that their regular jobs were not available due to the pay cut. Most reported that they had heard about not reporting for work and the pay cut through union officials. The claims deputy determined that the claimants were ineligible for unemployment compensation benefits because they had lost their employment due to a labor dispute in which they participated at the establishment where they worked.

Appeals from these determinations were consolidated and heard by the Appeals Tribunal on May 5, 1980. The Appeals Tribunal affirmed the determination of the claims deputy. The employees appealed to the Commissioner of the Department of Economic Security (the Commissioner). The Commissioner's Representative vacated and set aside the decisions of the Appeals Tribunal and substituted the decision that the employees were separated from their employment due to a lockout. Sunstar petitioned this court for a writ of certiorari under Minn.R.Civ.App.P. 115.01. We find none of the relator's arguments regarding lack of jurisdiction or faulty notice of appeal to the Commissioner persuasive and review the case under the writ of certiorari.

The issue before this court, simply stated, is whether, on the record as a whole, there is substantial evidence to support the decision of the Commissioner that the claimants were separated from their employment due to a lockout.

The Minnesota legislature has declared its policy that "unemployment reserves * * * be used for the benefit of persons unemployed through no fault of their own." Minn.Stat. § 268.03 (1980). *Loftis v. Legionville School Safety Patrol Training Center, Inc.*, 297 N.W.2d 237, 238 (1980). An eligible claimant will be paid unemployment compensation unless some disqualification is proved. Under the facts of this case, if the claimants left their employment due to a lockout, they are eligible for benefits. If they left due to a strike, they are disqualified from receiving benefits. Minn.Stat. § 268.09, subd. 3 (1980).[1] The burden of showing circumstances which bring a claimant within the disqualifying provisions of the statute is on the employer. *Johnson v. Ford Motor Co.*, 289 Minn. 388, 184 N.W.2d 786, 63 A.L.R.3d 74 (1971); *Adelsman v. Northwest Airlines, Inc.*, 267 Minn. 116, 125 N.W.2d 444 (1963).

The statutory definition of a lockout in the Minnesota Labor Relations Act is "the refusal of the employer to furnish work to employees as a result of a labor dispute." Minn.Stat. § 179.01, subd. 9 (1980). Sunstar would have this court interpret this provision strictly: Since the employer did offer work, albeit at a lower wage, as evidenced by the posted work schedule, there was no refusal to furnish work, hence no lockout. The employees would have this court interpret the definition of lockout as we did in *Hessler v. American Television & Radio Co.*, 258 Minn. 541, 104 N.W.2d 876 (1960). In *Hessler*, claimants were 49 employees who walked off the job when the employer announced a reduction in wages of 2–4 percent. There we affirmed the finding of the Appeals Tribunal that such modest pay decreases were not so harsh as to constitute a lockout. We there implied, and here hold, that the unilateral imposition by an employer of employment terms so unreasonable that the employees have no alternative but to leave constitutes a lockout. In the case at bar we are faced with a determination by the Commissioner that "the drastic wage reductions [exceeding 20 percent] unilaterally imposed by the employer" were, in fact, so harsh a condition of employment as to create a lockout.

Whether there has been a lockout is a question of fact to be determined by the Commissioner on all the facts developed at the hearing. *Carper v. Administrator, Unemployment Compensation Act*, 139 Conn. 515, 95 A.2d 378 (1953). *See also D. J. B. Collieries v. Kentucky Unemployment Insurance Commission*, 385 S.W.2d 772 (Ky. 1964). Sunstar argues that the evidence does not support a finding that the proposed contract, as initiated on February 4, 1980, was unreasonable and therefore caused the employees to leave work. Relator further argues that no rule mandates that employers must offer wage increases in the course of contract negotiations and that any decrease in wages would be offset by an increase in the number of hours guaranteed per week.[2] In considering whether

---

1. Minn.Stat. § 268.09, subd. 3, reads in relevant part:

    Labor dispute. An individual who has left or partially or totally lost his employment with an employer because of a strike or other labor dispute at the establishment in which he is or was employed shall be disqualified for benefits:
      (a) For each week during which the strike or labor dispute is in progress; or
      (b) For one week following the commencement of the strike or labor dispute if he is not participating in or directly interested in the strike or labor dispute.

      &ast;   &ast;   &ast;   &ast;   &ast;   &ast;
    For the purpose of this subdivision the term "labor dispute" shall have the same definition as provided in the Minnesota labor relations act. Nothing in this subdivision shall be deemed to deny benefits to any employee:
      &ast;   &ast;   &ast;   &ast;   &ast;   &ast;
      (b) who becomes unemployed because of a lockout * * *.

2. Sunstar also maintains that employees must be terminated before they are eligible for unemployment compensation benefits, but neither the eligibility statutes nor the cases from other

a unilaterally imposed wage reduction is so unreasonable as to constitute a lockout, it is instructive to look at cases which have determined whether a particular wage reduction is good cause for a voluntary termination of employment.

> [When] we have considered the issue of disqualification [from unemployment compensation benefits] where a claimant either quit work because of a pay reduction in his regular job or, when faced with a layoff, refused to accept an alternate job at a reduction in salary * * * [we have] support[ed] the general rule that a substantial pay reduction gives an employee good cause for quitting.

*Scott v. The Photo Center, Inc.*, 306 Minn. 535, 536, 235 N.W.2d 616, 616–17 (1975) (citations omitted). Where we have faced cases involving a reduction in wages, we have found "good cause [for employment separation] due to the employer" when wages were cut 25 percent. *Id.* When the wage cut amounted to 2–4 percent, we found no good cause but accepted the principle that good cause could be applied to other situations. 258 Minn. at 549–51, 104 N.W.2d at 881–83.

■ Other courts have found a decrease in wages of about 20–25 percent a good cause for separation from employment. *See, e. g., Bunny's Waffle Shop, Inc. v.*

*California Employment Commission*, 24 Cal.2d 735, 151 P.2d 224 (1944); *International Spike, Inc. v. Unemployment Insurance Commission*, 609 S.W.2d 374 (Ky.1980); *Johns-Manville Products Corp. v. Board of Review*, 122 N.J.Super. 366, 300 A.2d 572 (1973). When other courts have found no good cause for employment separation, the decrease in wages was less than 15 percent, similar to the situation we encountered in *Hessler. See, e. g., Longobardi v. Unemployment Insurance Appeal Board*, 287 A.2d 690 (Del.Super.1971); *Zanesville Rapid Transit, Inc. v. Bailey*, 168 Ohio St. 351, 7 Ohio Op.2d 119, 155 N.E.2d 202 (1958); *Kochansky v. Unemployment Compensation Board of Review*, 30 Pa.Cmwlth. 268, 373 A.2d 777 (1977); *In re Anderson*, 39 Wash.2d 356, 235 P.2d 303 (1951).[3]

■■ Judicial review of a contested case decision in an administrative department is governed by Minn.Stat. § 15.0424–.0426 (1980), of the Minnesota Administrative Procedure Act. The standard to be used by the reviewing court is whether the findings of the department are supported by substantial evidence in view of the entire record submitted, are affected by an error of law, or are arbitrary or capricious. Minn. Stat. § 15.0425(d)–(f); *Continental Can Co. v. State*, 297 N.W.2d 241 (Minn.1980); *Bartell v. National Valve & Manufacturing Co.*,

jurisdictions support Sunstar's position. Minn. Stat. § 268.08, subd. 1 (1980), governing eligibility benefits, states that an individual shall be eligible for benefits once (1) he has registered for work; (2) he has made a claim for benefits; (3) he was able to, available for, and actively seeking work; and (4) he has been unemployed for the waiting period of one week. Some cases have involved workers who are not terminated and who still considered themselves employees of the employer in question. *See, e. g., Assif v. Adm'r Unempl. Comp. Act*, 137 Conn. 393, 77 A.2d 772 (1951); *McKeesport Area School Dist. v. Unempl. Comp. Bd. of Review*, 40 Pa.Cmwlth. 334, 397 A.2d 458 (1979). The lockout victim is equally unemployed whether or not terminated. The legislative policy of providing relief to the unemployed by allowing unemployment compensation benefits to be paid to lockout victims would apply in either situation.

3. Sunstar is correct in stating that it is not illegal or unfair for an employer to bargain for lower wages. But imposition of lower wages

as terms and conditions of employment is considerably different than proposing the same terms in the course of collective bargaining and negotiation. We look to the result of the imposition of such terms of employment: If they are unreasonably onerous, we can find good cause for leaving work. Sunstar's imposition of lower wages and benefits bears little resemblance to the "model" package of lower wages and benefits they cite, Chrysler Corporation's agreement with the United Auto Workers. In the Chrysler agreement, the final terms and conditions were agreed upon by both sides in negotiation, not unilaterally imposed by the employer. Chrysler made significant concessions, including more labor control in management of the company. *See, e. g., Labor Reassessment*, Wall St. J. Feb. 19, 1981 at 30; *Pleas for Labor relief flood into the UAW*, Bus. Week, Feb. 16, 1981 at 27; Hoerr, *Auto workers inch toward the driver's seat*, Labor Commentary, Bus.Week, Feb. 9, 1981 at 30.

302 Minn. 521, 525, 223 N.W.2d 476, 478 (1974). The Commissioner could have determined on this record that wage cuts of 21–26 percent unilaterally imposed by the employer were such an unreasonable condition of employment that the employees had no alternative but to leave, and that the employees felt, on the basis of past experience, that they could not rely on the employer's promised "real" guarantee of 38 hours of work each week. We affirm the decision of the Commissioner that the claimants were separated from their employment due to a lockout and qualified for unemployment compensation benefits.

Affirmed.