**Dan V. MOORE, et al, Relators,**

v.

**ALLIED AVIATION FUELING COMPANY OF MINNESOTA, INC., State of Minnesota, Department of Economic Security, Respondents.**

**No. C7–85–1925.**

Court of Appeals of Minnesota.

April 8, 1986.

**42**

David S. Anderson, St. Paul, for relators.

Dale E. Beihoffer, Reid Carron, John Haine, Minneapolis, for Allied Aviation Fueling Company of Minnesota, Inc.

Hubert H. Humphrey, III, Atty. Gen., Peter C. Andrews, Asst. Atty. Gen., St. Paul, Dept. of Jobs and Training, St. Paul, for State of Minnesota, Dept. of Economic Security.

Heard, considered and decided by LESLIE, P.J., and PARKER and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

A referee of the Department of Economic Security denied relators' application for unemployment compensation benefits on the grounds that their unemployment was due to their participation in a strike against their employer, respondent Allied Aviation Fueling Company of Minnesota, Inc. Relators appealed to the representative of the Commissioner of Economic Security, who affirmed the referee's determination. This court granted certiorari to review relators' claim that they are entitled to unemployment benefits because their unemployment was a result of a lockout. We affirm.

## FACTS

Respondent Allied Aviation Fueling Company of Minnesota, Inc. is engaged in the business of fueling aircraft and ground equipment at the Minneapolis-St. Paul International Airport. Prior to December 13, 1984, relators were employed as mechanics by Allied, working in the areas of fuel service and facility maintenance.

Relators are members of the International Association of Machinists and Aerospace Workers. Their employment with Allied was governed by a collective bargaining agreement, effective December 14, 1982 through December 13, 1984. The contract was to be automatically extended from year to year unless Allied or the union gave notice of intent to alter its terms or terminate the contract. The agreement provided for a standard work week of forty

hours and set wage rates for all job classifications. Overtime was not guaranteed by the contract; however, the evidence indicates that only a few employees did not work overtime and that overtime wages constituted at least 7% of the total wages paid for hours actually worked by the employees.

On November 1, 1984, the parties began to negotiate a new contract. Allied proposed a wage reduction; the records indicate the proposal called for a 15% reduction for the first year, followed by 5% wage increases for each of the next two years. In the alternative, Allied proposed hiring part-time employees in fuel servicing jobs and implementing a two-tier wage system for all employees, so that employees hired after December 14, 1984 would be paid much less than the wages paid to employees already working for Allied; evidence shows that starting wages for new employees would range from 36.5% to 53.5% less than wages for present workers. Voicing its concern that the proposal to hire part-time employees would eliminate all overtime work and thus effectively reduce the present employees' wages by a significant amount, the union rejected Allied's proposals. Two subsequent bargaining sessions were similarly unsuccessful.

On December 10, Allied presented the union with a document entitled "Company Final Offer." The final offer adopted Allied's proposal to hire part-time workers and to implement the two-tier wage system. By its terms, the offer would take effect on December 14. The union again refused to accept Allied's proposals.

Prior to December 13, the union voted to authorize a strike if an agreement could not be reached and obtained permission from the airport to picket in the event of a strike. Allied also took preparatory steps, including advertising for and interviewing replacement workers and bringing in additional supervisory personnel. On December 11, union members received a "Negotiations Report" stating that the union had set the strike date for 12:01 a.m. on December 14, 1984.

On December 13, Allied employees reported for their usual shifts. In the afternoon, various workers cleaned out their lockers and gathered together their personally owned tools. At approximately 9:30 p.m., Allied's director of fueling operations, Bruce Pashley, indicated to the employees who were present that they could leave and that they would be paid for the remainder of their shifts. Supervisors collected the employees' identification badges, which employees need to pass through the airport and into their work areas.

Prior to 11:00 p.m., when an employee called and asked if the 11:00 p.m. shift employees should come to work, Allied's labor relations representative told him the employees should report to work at the regular time. The employees arrived at approximately 11:00, accompanied by the head of the union negotiating committee, Donald Wahnschaffe. The labor relations representative testified that he spoke with the employees, telling them that he understood they were going out on strike at midnight. Wahnschaffe confirmed that the strike was scheduled to begin at midnight. The labor relations representative then told the employees that because Allied had brought in supervisory employees to replace the striking employees, it would be "awfully uncomfortable for both of you all to be here simultaneously." He told them that Allied would therefore pay the employees for eight hours of work but that they should leave the premises immediately instead of working for one hour and then leaving to begin the strike. Although there was no evidence that any vandalism actually occurred or that there were threats of vandalism, Bruce Pashley testified that Allied took these precautions because of the potential for damages to Allied's property. Based on instructions of Allied's representative, the employees gathered their belongings, turned in their badges, and departed. All employees who were scheduled to work on December 13 were paid for their entire shifts.

At approximately 11:59 p.m., Allied locked the employee-access gates. The un-

ion began picketing on December 14. On December 18, Allied sent to each union employee a telegram stating that the company intended to continue its operations despite the strike. The telegram told employees that if they did not return to their regularly scheduled shift on December 21, a permanent replacement would be hired in their stead. On January 8, 1985, the striking employees received another letter from Allied. This letter told the employees that a substantial number of replacements had been hired but that some jobs remained open and available. The letter indicated that any employee submitting an unconditional request to return to work would be rehired under the terms of the company's final offer, *i.e.*, with no reduction in pay. None of the striking employees responded to Allied's offer of employment.

The union members applied for unemployment compensation. An extensive hearing was held to determine whether they were on strike or whether they had been locked out, either actually or constructively. Following the hearing, the Department referee determined that the members were unemployed "because of a labor dispute in which [they] participated at the establishment at which [they] were employed" and were not separated because of either a constructive or actual lockout. Thus, the referee found relators to be ineligible for unemployment compensation benefits. Relators appealed to the Commissioner's representative, who affirmed the referee's conclusion.

### ISSUE

Did respondent's actions constitute a lockout, either actual or constructive?

### ANALYSIS

■ The determination of whether there has been a lockout is a question of fact to be determined by the Commissioner on all the facts developed at the unemployment compensation hearing. *Sunstar Foods, Inc. v. Uhlendorf,* 310 N.W.2d 80, 83 (Minn.1981). Judicial review is limited to determining whether the findings are sup-

ported by substantial evidence in view of the entire record submitted, are affected by an error of law, or are arbitrary or capricious. *Id.* at 84.

Unemployment compensation benefits are reserved for persons unemployed through no fault of their own. Minn.Stat. § 268.03 (1984). The unemployment compensation benefits statute provides:

> An individual who has left or partially or totally lost his employment with an employer because of a strike or other labor dispute at the establishment in which he is or was employed shall be disqualified for benefits.

> \* \* \* \* \* \*

> Participation [in a strike or labor dispute] includes the failure or refusal of an individual to accept and perform available and customary work at the establishment.

> \* \* \* \* \* \*

> Nothing in this subdivision shall be deemed to deny benefits to any employee:

> \* \* \* \* \* \*

> (b) who becomes unemployed because of a lockout \* \* \*.

Minn.Stat. § 268.09, subd. 3 (1984).

The Minnesota Labor Relations Act defines "lockout" as "the refusal of the employer to furnish work to employees as a result of a labor dispute." Minn.Stat. § 179.01, subd. 9 (1984). For unemployment compensation purposes, a lockout is defined by reference to the Minnesota Labor Relations Act definition. *Metropolitan Medical Center v. Richardville,* 354 N.W.2d 867, 870 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. Mar. 1, 1985).

Relators first contend that an actual lockout occurred on December 13 when Allied sent the employees home before the midnight strike date arrived. An employer must make a maximum effort to protect employment by using methods short of lay-offs to prepare for a strike. Lay-offs effected absent the use of such alterna-

tive methods will be construed as a lock-out.

*Id.* at 870. In *Richardville,* the collective bargaining agreement between Metropolitan Medical Center and members of the Minnesota Nurses Association expired and negotiations for a new contract were unsuccessful. Ten days prior to the strike date, the union served notice on the employer of its intent to strike, as required by the National Labor Relations Act. During those ten days, the employer invoked a contingency plan that involved reducing both the patient census and the nursing staff. The employer laid off approximately ten percent of the nurses; however, the parties ratified a new collective bargaining agreement before the strike date and no strike occurred. *Id.* at 868–69. This court found that because the employer made no effort to avoid or delay work force reductions and did not attempt alternative methods of reduction such as voluntary leaves, it had not made the maximum effort to protect employment, and thus, the layoffs constituted a lockout. *Id.* at 870.

Unlike the employer in *Richardville,* Allied's minimal efforts on December 13 to protect operations at its facility was not such an anticipatory layoff of employees as to constitute an actual lockout. First, because Allied paid the employees for their shifts, an argument that sending the employees home early was an economic weapon is untenable. *See id.*

■ In addition, it cannot be said here that the employer refused to furnish work independent of any fault of the employees. *See Bucko v. J.F. Quest Foundry Co.,* 229 Minn. 131, 143, 38 N.W.2d 223, 231 (1949). The determinative fault is that which is the "ultimate and final act causing the unemployment," not a "preliminary act." *Id.* Here, the strike began an hour after the employees' scheduled work shift began, the employees were paid for the shift from which they were sent home early, and they subsequently received two offers from the employer to return to their jobs. Allied's actions on December 13 were not a refusal to furnish work to employees as a result of

the labor dispute, but were only preliminary acts taken to avoid potential conflicts between supervisory employees brought in to perform the jobs of the employees whose strike date was imminent. Nor is this a case where the employer discharged employees who were about to enter upon a strike. *See id.* at 142, 38 N.W.2d at 230. We agree with the Commissioner's representative that no actual lockout occurred.

Relators further contend, however, that a constructive lockout occurred when Allied unilaterally imposed the terms of its final offer on the employees. Relators rely on *Sunstar,* where the Minnesota Supreme Court held that

> the unilateral imposition by an employer of employment terms so unreasonable that the employees have no alternative but to leave constitutes a lockout.

*Sunstar,* 310 N.W.2d at 83. Relators argue that the provision in Allied's final offer for the hiring of part-time employees would have operated to deprive them of all of their overtime pay. They claim that the final offer constituted such a substantial change in the terms of the negotiated contract as to constitute a constructive lockout under the *Sunstar* analysis. We cannot agree.

■ In *Sunstar,* the employer's final offer included a decrease of 21–26% in the employees' wages. The court in *Sunstar* scrutinized cases that considered whether a particular wage reduction was good cause for a voluntary termination of employment to decide whether the unilaterally imposed wage reduction was so unreasonable as to constitute a lockout. *Id.* at 83–84. Those cases, all from other jurisdictions, indicate that decreases in wages of less than 15% are generally not sufficient to justify an employee's voluntary termination and decreases in excess of 20–25% provide good cause for an employee to leave their employment. *Id.* at 84. Accordingly, the supreme court concluded that the 21–26% cut in wages in *Sunstar* involved terms so unreasonable as to constitute a constructive lockout.

The cases involving "good cause" to quit have consistently indicated that there must first be a substantial wage reduction, a reduction in benefits, or a breach of an employment agreement. *See, e.g., Scott v. The Photo Center, Inc.*, 306 Minn. 535, 235 N.W.2d 616 (1975); *Helmin v. Griswold Ribbon & Typewriter*, 345 N.W.2d 257, 260–61 (Minn.Ct.App.1984). In each of those cases, however, the employer had breached an actual promise or agreement to provide those benefits. Here, although the original negotiated contract established a standard forty hour work week and detailed how overtime pay provisions applied, it did not promise that the union employees would be guaranteed any certain amount of overtime work.

Relators argue that despite the absence of an express guarantee of overtime work, the past practices of Allied must not be ignored but should be read into the contract's terms. The evidence indicates that Allied employees regularly worked overtime hours. The contract itself guaranteed an equal distribution of overtime work among the employees. This court, in distinguishing "wages" from "advances" on wages, has indicated that where no advances were promised, an employee is not entitled to them. *See Rutten v. Rockie International, Inc.*, 349 N.W.2d 334, 336 (Minn.Ct.App.1984); *Cary v. Custom Coach, Inc.*, 349 N.W.2d 331, 332 (Minn.Ct. App.1984). Similarly, where overtime is not promised, it is not a term of the employment agreement. Here, the potential elimination of overtime work did not constitute such a substantial change in the employment contract as to constitute a lockout.

Moreover, even if we were to find an implied guarantee of overtime in the contract, the employees' overtime pay has evidently constituted only a small percentage of Allied employees' wages in the past. Even if no further overtime work is available to the employees, this decrease in wages is not of the substantial kind found in *Sunstar* to show a constructive lockout.

We also recognize the national labor policy that views overtime pay more as a penalty against employers than as a benefit for employees. Unemployment and underemployment are grave and ongoing concerns. Employers who hire fewer workers but who require them to work excessive hours deprive other potential employees of viable employment opportunities. Thus, policymakers have determined that it is preferable for employers to hire more people, thereby spreading employment more evenly throughout the population. *See, e.g., Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 577–78, 62 S.Ct. 1216, 1219–20, 86 L.Ed. 1682 (1942). Allied's proposed employment of part-time workers is consistent with this national labor policy.

Finally, we acknowledge that relators have concerns about the welfare of future employees or about adverse effects of the two-tier system on future bargaining with the employer. The two-tier wage scale provides future employees with earnings drastically less than relators' pay. In addition, we can appreciate that lower wage scales decrease the prevailing wage benefits for all laborers, thus affecting minority groups who seek pay comparable to prevailing wage patterns for others. These concerns may beg for further public policy determinations on the subject. They do not, however, come within grievances now recognized as so compelling that the employer has engaged in a constructive lockout of present employees.

### DECISION

The Commissioner's representative did not err in concluding that no lockout, either actual or constructive, occurred. Relators are not entitled to unemployment compensation benefits because their unemployment was the result of a strike.

Affirmed.