[L. A. No. 28621. In Bank. Feb. 3, 1966.]

COAST PACKING COMPANY et al., Plaintiffs and Appellants, v. CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., Defendants and Respondents.

Munger, Tolles, Hills & Olson, Roderick M. Hills, Frederick B. Warder, Jr., Christian E. Markey, Jr., Munger, Tolles & Hills and William J. Bird for Plaintiffs and Appellants.

Angell Adams, Gochnauer, Elder & Holmes and Andrew H. Field as Amici Curiae on behalf of Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Defendants and Respondents.

Fishman & George, Stanley J. Fishman, Charles P. Scully, Bodle & Fogel, George E. Bodle, Daniel Fogel, Stephen Reinhardt and Loren R. Rothschild as Amici Curiae on behalf of Defendants and Respondents.

PEEK, J.—Plaintiffs appeal from a judgment denying their petition for a writ of mandate to compel defendant Unemployment Insurance Appeals Board to set aside its award of unemployment compensation benefits to plaintiffs' employees, and thus avoid depletion of plaintiffs' reserve accounts. (Unemp. Ins. Code, §§ 1025, et seq.)

In 1961 plaintiffs (various companies engaged in the meat-packing and processing business and associated for collective bargaining purposes) were negotiating with Butchers Union Local No. 563, the bargaining representative of the com-

panies' employees, in an effort to effect a collective bargaining agreement to replace the existing one which would expire on October 1 in that year.

Plaintiffs contend that because meatpackers must keep large numbers of live animals and amounts of highly perishable meat on hand, their industry is peculiarly susceptible to labor strikes. It is further argued it had been their experience that because of the perishability of their commodity a labor union representing their employees would be afforded an unfair advantage should the packers be caught in a strike with large inventories on hand, and that the union in the instant case had been inclined to exploit such an advantage.

During negotiations for the 1961 contract the packers sought assurance from the union that no strike would be called without first giving the packers an opportunity to clear their pens and coolers. Such assurance was refused, as was a request for an extension of the existing agreement with a provision that any new contract would be retroactive. Accordingly, the packers commenced to shut down operations prior to the end of September, and by the 29th of September most of the members of the association had shut off supplies and substantially cleared their pens and coolers. On the 30th of September the union offered to extend the existing contract for ten days. The association refused and the packinghouses closed on October 2. Finally, on October 18 an agreement was reached and the packinghouses reopened. The unemployment insurance benefits involved are for the period October 2 to 18, during which period plaintiffs' employees were without work.

The only issue presented on the petition and on the appeal from the denial thereof is whether plaintiffs' employees were disqualified from receiving unemployment benefits by reason of section 1262 of the Unemployment Insurance Code. That section provides in pertinent part: "An individual is not eligible for unemployment compensation benefits . . . if he left his work because of a trade dispute."

It has been consistently held that an employee is not disqualified by section 1262 unless he voluntarily left his work because of a trade dispute. This holding was first reached in *Bodinson Mfg. Co.* v. *California Emp. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935], where employees had refused to cross a picket line. In *Ruberoid Co.* v. *California Unemployment Ins.*

*Appeals Board* (1963) 59 Cal.2d 73, we held at pages 77 and
78 [27 Cal.Rptr. 878, 378 P.2d 102] that *Bodinson* "estab-
lishes the volitional test, holding that the unemployment
must result from the voluntary act of the employee and not
from the act of others. In sustaining the disqualification of
the worker who voluntarily refused to cross the picket line of
a union other than his own, we said: 'In brief, disqualifica-
tion under the act depends upon the fact of voluntary action,
and not the motives which led to it. . . . The act merely sets
up certain conditions as a prerequisite to the right to receive
compensation, and declares that in certain situations the
worker shall be ineligible to receive compensation. Fairly
interpreted, it was intended to disqualify those workers who
*voluntarily leave their work because of a trade dispute.*' (P.
328; emphasis added.) "

Following *Bodinson,* we held that where employees ceased
work because an employer reduced wages 25 percent and
made other changes in working conditions designed to put
pressure on the employees' union, the work stoppage was
attributable to the employer's action. (*Bunny's Waffle Shop,
Inc.* v. *California Emp. Com.* (1944) 24 Cal.2d 735 [151 P.2d
224].) Although in that case the employees ceased work *dur-
ing* a trade dispute they left because of unfavorable changes
in working conditions, and not to force the employer to
accept their demands or *because* of a trade dispute.

The nature of the critical volitional act is further indi-
cated in *McKinley* v. *California Emp. etc. Com.* (1949) 34
Cal.2d 239 [209 P.2d 602], and *Gardner* v. *State of Califor-
nia* (1959) 53 Cal.2d 23 [346 P.2d 193], wherein it was held
that where a labor union strikes one employer of a multi-
employer bargaining association, which strike causes the
other employers to cease operations, all members of the labor
union who thus become unemployed are deemed to have
voluntarily left their work, including those not striking. The
court reasoned that since the union had been dealing with the
association, a strike against one member should be considered
in the same sense as a strike against all.

██ If employees are to be denied benefits it is apparent
that there must be some volitional conduct on their part
which reasonably causes the work stoppage. ██ There was
no such conduct in the present case. It appears that the
union only refused to give some assurance that it would not

take such action. In that circumstance there was no volitional act which reasonably would warrant a work stoppage, and the workers cannot be held to have voluntarily left their work because of a trade dispute when the employers elected not to operate in the absence of the requested assurances.

Conceding that no strike threat was expressly made, plaintiff employers nevertheless claim that the very lack of such threats was a part of the union strategy, which they term "the packinghouse techniques," designed to lull the employer into inaction until a sudden strike could be called at a time when the packers had to make unreasonable concessions because of economic coercion.

There is, of course, always a threat of strike in the absence of a collective bargaining agreement, and one of the recognized tools available to a labor union is the application, by striking, of economic coercion designed to persuade an employer to the union's point of view. If we were to conclude that the unarticulated threat of economic coercion is a sufficient volitional act to disqualify an employee when his employer ceases operations rather than continue under a claimed threat, what action on the part of the union can be deemed to constitute such threat? Certainly it cannot be the mere association of employees for collective bargaining purposes. Nor can the further circumstance that negotiations are under way and the union has rejected employer proposals for ground rules during negotiations require disqualification. That, in substance, is our case.

 Although plaintiffs' shutdown appears to have been a prudent act and economically justified, the statutory scheme for unemployment compensation benefits does not take these matters into consideration nor set the meatpacking industry apart from other industries. Moreover, the statute is directed not to industries, but to workers, and the policy of the statute is declared to be to create a fund "providing benefits for persons unemployed *through no fault of their own.*" (Unemp. Ins. Code, § 100.) (Italics added.) Eligibility for benefits is thus to be determined by the worker's conduct and circumstances rather than the problems imposed on the employer in making those benefits available. It is obvious that strikes and threats of strikes will have varying effects on different industries, and if particular industries require particular protection the declaration thereof should be made by the Legislature. Accord-

ingly we can discern no basis for imposing upon a worker in the meatpacking industry a different test from that in the case of other workers for the determination of when "he left his work because of a trade dispute." (Unemp. Ins. Code, § 1262.)

█ It is suggested on behalf of plaintiffs, by implication at least, that the so-called volitional test is inadequate in certain circumstances and should be supplemented or modified to not penalize an employer where a shutdown is warranted. The obvious answer is that the volitional test is the result of a construction of section 1262, and there is no room in the language of that section which allows for the suggested modification. Moreover, the net effect of such a limitation of the rule would be to disqualify an employee because an employer closed his plant to avoid economic loss. This would surely defeat the very purpose of the scheme of unemployment insurance benefits, and justify almost every closure, including lockouts. Finally, the only cases cited in behalf of plaintiffs involving a statute similar to ours fail to support the proposal, as in those cases the shutdowns were justified as having occurred in anticipation of a strike which the union had theretofore announced. (*Climax Fire Brick Co.* v. *Unemployment Comp. Board of Review,* 166 Pa. Super. 481 [72 A.2d 300] ; *Erie Forge & Steel Corp.* v. *Unemployment Comp. Board of Review,* 188 Pa. Super. 405 [146 A.2d 751].) There the necessary volitional acts clearly appeared. (Cf. *American Shipbuilding Co.* v. *National Labor Relations Board* (1965) 380 U.S. 300 [85 S.Ct. 955, 13 L.Ed.2d 855].)

For the foregoing reasons the judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment for the reasons expressed by Justice Lillie in the opinion prepared by her for the District Court of Appeal in *Coast Packing Co.* v. *California Unemployment Ins. Appeals Board* (Cal.App.) 45 Cal.Rptr. 788.

Appellants' petition for a rehearing was denied March 2, 1966.