[No. B030818. Second Dist., Div. Six. Dec. 29, 1988.]

JESUS R. MARTINEZ et al., Plaintiffs and Appellants, v.
CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS
BOARD, Defendant and Respondent;
JULIUS GOLDMAN'S EGG CITY, Real Party in Interest and
Respondent.

**1386**

**COUNSEL**

Robert K. Miller and M. Carmen Ramirez for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, and Anne S. Pressman, Deputy Attorney General, for Defendant and Respondent.

Robert P. Roy for Real Party in Interest and Respondent.

**OPINION**

**STONE (S. J.), P. J.**—Appellants applied for and were denied unemployment insurance benefits. Respondent upheld the decision of the California Employment Development Department and the administrative law judge, ruling appellants were ineligible for benefits under Unemployment Insur-

ance Code section 1262,* the "trade dispute" disqualification. Appellants challenged this decision by filing a petition for writ of mandate in the superior court. Their petition was denied. Appellants here seek to reverse that judgment. We affirm.

*Background*

The facts are undisputed. Appellants are former employees of Egg City at the Moorpark and Nipomo plants, leaving this employment in June 1986.

In July 1984, the United Farm Workers of America, AFL-CIO (UFW), entered into a collective bargaining agreement with Egg City on behalf of its agricultural workers. That agreement covered the period from January 1984 to September 1, 1985.

Egg City was sold in May 1985. The new owners informed the UFW that the wages and benefits paid to the employees put the company in an unfavorable competitive position.

In August 1985, negotiations began for a new collective bargaining agreement. No new contract was ever agreed upon.

In April 1986, Egg City began implementing changes in working conditions, contending there was an impasse in negotiations. These changes included reducing the amount of free eggs that were given to workers, changing performance and work standards, and increasing workloads of some employees without corresponding wage increases. The UFW protested these changes and most of Egg City's employees did not show up for work for one day to support the union's position.

In May 1986, the company implemented more changes in work rules, including restrictions on the number of visits employees could make to the restroom during work. (This policy was later revoked.) Also in May 1986, the company filed a Chapter 11 bankruptcy proceeding in federal court.

In June, Egg City decided not to give its workers any more free eggs, contending the change was implemented following an impasse in negotiations. On June 11, the bankruptcy court judge granted the company's petition to reduce wages by $2 per hour, to reduce vacation pay for employees with five or more years seniority, to reduce pension contributions, eliminate one paid holiday, and change medical carriers.

---

* All statutory references are to the Unemployment Insurance Code.

The wage cuts constituted a 27 to 33 percent reduction in earnings for employees. The wage cuts in combination with the reduced benefits comprised a 34 to 41 percent earnings reduction.

On June 13, half of the employees received paychecks which contained the wage cuts in accordance with the bankruptcy court's order and, on June 20, the rest of the work force received their reduced wages.

On June 22, UFW President Cesar Chavez led Egg City employees and supporters in a march in protest of the company's negotiation posture and the wage cuts. Except for a few employees, appellants' last day of work was June 23. When appellants at the Moorpark plant reported for work on June 24, they observed that a picket line had been established and refused to cross it. Although no picket line was established at the Nipomo plant, appellants there testified they went on strike on the morning of June 24. On June 28, the UFW officially sanctioned the strike. Appellants never returned to work at Egg City, and eventually were replaced permanently. They were held entitled to receive unemployment insurance benefits effective the week after their permanent replacements were hired.[1]

Despite testimony by appellants that the reduction in wages was the primary reason why they left their employment at Egg City,[2] respondent noted in its decision that, on their last day of work, June 23, appellants left at quitting time without discussing the new wages and working conditions among themselves[3] and, when reporting for work the following day, decided to join the picket line (or to strike). Respondent concluded, therefore, that the employees who chose not to cross the picket line voluntarily left their work as the result of the trade dispute.

The trial court, in upholding respondent's decision, commented that the wage cuts instituted by Egg City were "catastrophic" because they slashed an otherwise low wage by "enormous quantities." But the court stated that, however sympathetic it was to appellants' plight, "you can draw unemployment benefits when your wages are cut and you feel the necessity to leave and get other employment. But if in fact that same set of facts occurs during a trade dispute, that . . . you can't get unemployment benefits."

---

[1] In *Ruberoid Co.* v. *California Unemployment Ins. Appeals Board* (1963) 59 Cal.2d 73 [27 Cal.Rptr. 878, 378 P.2d 102], the Supreme Court held that the permanent replacement of striking workers signifies the workers' subsequent unemployment is caused by the unavailability of their jobs, rather than by the trade dispute, therefore entitling the replaced employees to unemployment benefits.

[2] Appellants also testified at the administrative hearing that they left work to put pressure on Egg City to sign a contract with reasonable conditions.

[3] Apparently, appellants also did not discuss the changes with their supervisors.

## Discussion

The sole question on appeal is appellants' eligibility for unemployment insurance benefits from June 24, 1986, when they refused to cross the picket line, to the time of their permanent replacement.

When the facts before the administrative agency are uncontroverted, as in the present case, the trial court's determination involves only a question of law. Appellate review in such a case is based upon the independent judgment rule, not the substantial evidence rule. (*Brotherhood of Teamsters & Auto Truck Drivers* v. *Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1525 [236 Cal.Rptr. 78].)

Section 1262 reads: "An individual is not eligible for unemployment compensation benefits, and no such benefit shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

A two-part test is established for determining whether a claimant is ineligible to receive unemployment benefits under section 1262: First, the employee must voluntarily leave or remain away from his employment (the volitional test), and, second, the employee must leave or remain away from his employment because of the trade dispute (a causation test). (*Id.,* pp. 1525-1526, citing *Ruberoid Co.* v. *California Unemployment Ins. Appeals Board, supra,* 59 Cal.2d 73.) Whether a trade dispute exists depends on the facts of each case. (*Isobe* v. *Unemployment Ins. Appeals Bd.* (1974) 12 Cal.3d 584, 589 [116 Cal.Rptr. 376, 526 P.2d 528].)

The parties' disagreement concerns the cause of appellants' unemployment. Appellants contend that, since it was economically impossible for them to remain employees of Egg City, they left their employment because of the wage cuts; therefore, the trade dispute disqualification is inapplicable. Respondent claims that section 1262 is applicable because appellants left their employment, not when their wages were reduced, but only after the picket line was established or the workers decided to strike.

Exercising our independent analysis, we conclude that the facts establish appellants left their employment because of the trade dispute, and not simply during the course of a trade dispute. (See *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735, 740 [151 P.2d 224].) Appellants left work on June 23 with the apparent intention of returning to work the next

day. It was only after appellants observed the picket line at the Moorpark plant *when reporting for work* on June 24 that they decided not to cross it. The appellants at the Nipomo plant also worked through June 23, 10 days after Egg City employees began to receive their reduced paychecks on June 13. Appellants' unemployment therefore was caused by their own act (the volitional test) and was the direct result of a trade dispute by joining the picket line or striking (the causational test).

Appellants argue that their decision to join the picket line and to strike was not voluntary, but was compelled by economic necessity. However, disqualification under section 1262 depends upon the fact of voluntary action and not the motives which led to it. (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 328 [109 P.2d 935].) A picket line or strike is an economic weapon directed against the employer by a union and recognition of it by an employee amounts to participation by him in the trade dispute it represents. (*Bunny's Waffle Shop* v. *Cal. Emp. Com., supra,* 24 Cal.2d 742.) A decision to participate in a union picket line or strike has never been deemed involuntary in the eyes of the law.[4] (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.3d 321.)

Appellants rely on *Bunny's Waffle Shop, supra,* 24 Cal.3d 735 for the proposition that a 25 percent wage cut is a substantial reduction in earnings which is generally regarded as good cause for leaving employment.

In *Bunny's,* restaurant employers sought to force the unions to bargain with a new employers' organization by reducing wages to 75 percent of the previous wage, extending the work week and instituting split shifts. When a number of employees quit because of the new working conditions and wages, the employers closed the restaurants. No strike was authorized and the unions had in fact instructed their members to continue working when the changes were implemented. The Supreme Court ruled that, although all of this occurred during the course of a trade dispute between the employers and the unions, the employees did not leave their work because of the dispute. The new conditions and wages were not bona fide proposals related to the operation of the restaurants or part of the negotiation discussions

---

[4] Appellants contend that a decision to leave one's employment may not always be a voluntary one, citing *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239 [209 P.2d 602]. The *McKinley* decision is consistent with our holding. The court in *McKinley* recognized that the form of the termination of employment is not controlling and the determinative factor is the volitional cause of the work stoppage. (P. 243.) The court stated that an employee's decision to leave his employment is not freely made if it was compelled by an employer's economic weapon, citing *Bunny's Waffle Shop* v. *Cal. Emp. Com., supra,* 24 Cal.2d 735. Here, appellants made a decision to leave their employment due to an economic weapon utilized by the union, not the employer, therefore leaving work of their own free choice.

between the unions and the employers, but were utilized by the employers for the sole purpose of coercing the unions into collectively bargaining with the employers' representative. (24 Cal.2d 740-741.) Once deciding there was no direct causal link between the trade dispute and the unemployment, the Court then held that the wage cuts gave the employees good cause for leaving employment. (P. 743.)

The facts of *Bunny's* are inapposite to our case. In *Bunny's,* the economic weapon was created by the employers, not the employees, and it, rather than the trade dispute, was the cause of the leaving of work. (24 Cal.2d 742.) Here, the new owners of Egg City had informed the UFW that they considered the wages of the employees too high for competitive purposes, and the issue of wages thereafter became an ongoing subject of discussion during negotiations between the UFW and Egg City for a new collective bargaining agreement. When the wage cuts were imposed, the union protested by conducting a march, establishing a picket line, and authorizing a strike. Appellants' observance of the picket line and participation in the strike, rather than the imposition of the wage cuts themselves, was the cause of their leaving work. Moreover, unlike the situation in *Bunny's,* where the wage cuts ultimately led to the shutting down of the workers' places of employment, locking them out of their jobs (*id*. at p. 741), appellants' jobs never physically became unavailable to them.

It is therefore irrelevant as a matter of law whether or not appellants had good cause for leaving their employment. As the Supreme Court noted in *Bunny's,* had the claimants there left their work because of the trade dispute, it would be immaterial to inquire whether they had good cause for leaving. (24 Cal.2d 742.) The court in *Bunny's* looked beyond the finding of the presence of a trade dispute only upon concluding that the dispute was not the cause of the unemployment.

Appellants next urge that the bankruptcy order sanctioning the reduction of wages was an intervening independent factor which broke the chain of causation between their unemployment and the trade dispute. Not so. Eligibility for unemployment benefits is determined, not by looking at the employer's economic problems, but by determining the worker's conduct. (*Coast Packing Co.* v. *Cal. Unemp. Ins. Appeals Bd.* (1966) 64 Cal.2d 76, 80 [48 Cal.Rptr. 854, 410 P.2d 358].) Focusing on appellants' conduct, they left their jobs because they were protesting their reduced wages and benefits, not because their employer instituted bankruptcy proceedings.

Appellants next contend it is irrelevant that an employee leaves work because of a trade dispute where the presence of wage cuts creates such an

unreasonable condition of employment that the employee has no alternative but to leave, citing *Sunstar Foods, Inc.* v. *Uhlendorf* (Minn. 1981) 310 N.W.2d 80. *Sunstar* is a decision by the Minnesota Supreme Court which holds that drastic wage reductions exceeding 20 percent and unilaterally imposed by an employer constitute a lockout, making the employees eligible for unemployment benefits. (P. 83.) In so ruling, *Sunstar* relied upon the holding in *Bunny's* that a decrease of wages in the 25 percent range represents good cause for separation from employment. (P. 84.)

■, ■ Noting that the existence of controlling California legal precedent signifies that *Sunstar* need not be followed (see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), we nevertheless point out that *Sunstar* is distinguishable on its facts. Although the employees held eligible for benefits in *Sunstar* joined a picket line in protest of the reduced wages, they did so only after the union notified the employer that the employees could not work under the new wage structure and on the same day the employer implemented its contract proposal. (310 N.W.2d at p. 82.) Here, the facts establish that appellants observed the picket line or decided to strike some time after the wage cuts were implemented, and never, up to the time of taking these actions, informed their supervisors or the employer that they could not continue working under the new wage schedule. Thus, unlike the employees in *Sunstar,* appellants intended to continue working despite the reduced wages, indicating that they did not leave work because of the wage cuts.

■ Appellants next contend that the application of section 1262 to this case violates their equal protection rights. They explain that, since they had good cause to leave their employment, they are in the same position as other, nonunionized employees whose wages are drastically reduced, and therefore cannot be treated differently simply because of their unionization.

This argument has no merit. As respondent notes, appellants' decision to join the picket line signifies that they are not in the same position as employees who leave work for nonunion reasons. Further, the statute does not challenge the right of labor to strike or to maintain picket lines for legally sanctioned purposes. (*Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d 324.) The policy behind section 1262 is the maintenance of the state's neutrality in trade disputes. (*Ruberoid Co.* v. *California Unemployment Ins. Appeals Board, supra,* 59 Cal.2d 77.) This type of policy involves the recognition that the granting of benefits would place the employer at a disadvantage in bargaining collectively with the unions, and that it is the subsidization of union-initiated work stoppages that are the subject of regulation, rather than the subsidization of unemployed union members per se.

(See *Ohio Bureau of Employment Serv.* v. *Hodory* (1977) 431 U.S. 471, 492 [52 L.Ed.2d 513, 529, 97 S.Ct. 1898].)

The judgment is affirmed.

Abbe, J., concurred.

GILBERT, J.—I reluctantly concur. Here appellants' wages were effectively reduced 34 to 41 percent. The trial court made the lugubrious observation that the wage cuts here were catastrophic, were almost starvation wages, and put the workers in "an impossible situation." The trial court's reflection led him to perceptively conclude that the employees had no option but to leave.

Our Supreme Court in *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735, 743 [151 P.2d 224], stated: "A substantial reduction in earnings is generally regarded as good cause for leaving employment . . . ." In *Bunny's,* the court endorsed the California Employment Commission's finding that a 25 percent cut imposed upon a single worker would give him good cause for leaving his work.

When the reduction is as drastic as it was here, the employees' leaving work amounts to an involuntary act. Once the leaving is involuntary, the existence of a trade dispute should be immaterial. *Bunny's,* however, also states that "[h]ad claimants in the present case left their work because of the trade dispute, the merits of the controversy would be immaterial and there would be no occasion to inquire whether they had good cause for leaving. [Citations.]" (*Bunny's Waffle Shop* v. *Cal. Emp. Com., supra,* 24 Cal.2d at pp. 742-743.)

Because substantial evidence supports the finding that the employees left work because of the picket line, we must necessarily find the employees left work because of a trade dispute. The existence of good cause for leaving because of the drastic wage reduction is immaterial. (*Bunny's Waffle Shop* v. *Cal. Emp. Com., supra,* 24 Cal.2d at p. 742.) Had there been no picket line, it is unlikely the leaving would have been found to be connected to a trade dispute.

In such a case, the worker who attempts to go to work despite drastic wage reductions, and who thereby postpones or avoids collecting unemployment benefits or state aid, is penalized if he or she leaves when a picket line is formed. On the other hand, the employee who immediately leaves work

because of a drastic wage reduction before a picket line is ever called may still be able to collect unemployment benefits. This is both unjust and illogical.

I would like to see a change in the law so that when there is a drastic reduction in wages, an inquiry into the existence and nature of a trade dispute would not be necessary. Such a result is reasonable when a drastic wage reduction amounts to a lockout. (See *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239, 243 [209 P.2d 602].)

California should adopt the reasoning of the court in *Sunstar Foods, Inc.* v. *Uhlendorf* (Minn. 1981) 310 N.W.2d 80, which held that when wages are cut more than 20 percent, the terms of employment become so unreasonable that the employees have no choice but to leave work. An employee whose wages are drastically reduced may find a picket line to be the straw that breaks the camel's back. An employer should not be able to use the excuse of a trade dispute to prevent such an employee from collecting unemployment insurance benefits.

To pay unemployment compensation to an employee whose wages are so drastically reduced that he is put at the poverty level, does not violate the policy of neutrality by the state in trade disputes. In such a case, it should be the trade dispute that is immaterial rather than an inquiry into whether the employee had good cause for leaving work.

It is disingenuous to say that the state is subsidizing a party to a trade dispute when it pays unemployment compensation to a worker who, in essence, is locked out of his employment.