[No. C000334. Third Dist. Mar. 17, 1989.]

R. S. ACUFF et al., Petitioners, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD, Respondent;
GREYHOUND LINES, INC., Real Party in Interest.

COUNSEL

Neyhart, Anderson, Nussbaum, Reilly & Freitas, Peter D. Nussbaum and Elaine B. Feingold for Petitioners.

John K. Van de Kamp, Attorney General, Charlton G. Holland, Elisabeth C. Brandt and Dennis Eckhart, Deputy Attorneys General, for Respondent.

McCutchen, Doyle, Brown & Enersen, Jonathan H. Sakol, Mary Lu Christie and Leon C. Reivitz for Real Party in Interest.

Ronald A. Zumbrun, Anthony T. Caso and Richard M. Stephens as Amici Curiae.

**OPINION**

**PUGLIA, P. J.**—This case concerns the application of Unemployment Insurance Code section 1262 which renders ineligible for unemployment compensation employees who leave work because of a trade dispute. The petitioners are striking employees whose employer implemented a wage reduction after their collective bargaining agreement expired. As the wage reduction was an issue expressly tendered in negotiations which had reached an impasse, we shall conclude the statutory "trade dispute" disqualification renders these petitioners ineligible for unemployment compensation during the period they were on strike.

I

Petitioners are individual claimants who applied for unemployment compensation from the Employment Development Department (EDD) for the period they were on strike against their employer, real party in interest, Greyhound Lines, Inc. (Greyhound). The strike lasted 47 days from November 3, 1983, through December 19, 1983. EDD denied benefits by reason of Unemployment Insurance Code section 1262, which provides: "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed." (All subsequent references to sections of an unspecified code are to the Unemployment Insurance Code.)

Petitioners appealed EDD's decision. A hearing was conducted before an administrative law judge, who determined that petitioners left voluntarily because of a trade dispute and therefore were ineligible for benefits under section 1262. Petitioners then appealed to respondent Unemployment

Insurance Appeals Board (Board) which affirmed, adopting as its own the administrative law judge's statement of facts and reasons for decision.

Invoking the original jurisdiction of this court, petitioners seek a writ of administrative mandate (Code Civ. Proc., § 1094.5), directing the Board to set aside its decision denying benefits. While disclaiming any challenge to the Board's factual findings, petitioners maintain the Board abused discretion by "failing to follow established decisional law and by issuing a decision that is not supported by the factual record." We initially denied the writ petition without opinion. The Supreme Court granted review and retransferred the matter to this court with directions to issue an alternative writ and consider the merits of the petition. The parties agree that there are no material facts in dispute, only issues of law.

## II

The Amalgamated Council of Greyhound Local Unions (Council) and Greyhound were parties to a collective bargaining agreement which was due to expire at midnight on October 31, 1983. The agreement set forth the wages, hours, and working conditions of Greyhound employees among whom are petitioners in this case.

Although Greyhound sought midterm wage concessions in 1982, negotiations for a new contract began in earnest on September 14, 1983, when the Council and Greyhound exchanged written proposals. Greyhound submitted some 16 items, including a proposal to reduce wages and other employee benefits in order to reach "parity" with other class I motor carriers who were Greyhound's competitors. Other proposals specified reductions in company contributions to the pension fund as well as employee concessions in health benefits, holidays, vacations, meal allowances, etc.

On October 4, 1983, the Council submitted Greyhound's September 14 proposal to its members for a strike vote. The members overwhelmingly rejected the proposal and voted to authorize the Council to call a strike without setting a date for the strike. Greyhound was notified of the strike vote on October 25, 1985.

Meanwhile, the parties continued to negotiate without progress. At an October 26 meeting convened by a representative of the Federal Mediation Service, Greyhound for the first time verbally indicated it wanted a 9.5 percent reduction in wages.

Having failed to reach any agreement by October 31, the Council requested and Greyhound submitted in writing its "final offer." This was the first

written document in which the 9.5 percent wage reduction figure was specified. The document also spelled out certain other proposals for the first time, including one to eliminate a "successors and assigns" clause from the contract. The administrative law judge found this final offer would reduce combined wages and benefits by just over 17 percent below those in the contract which expired October 31. The Council rejected this last proposal because it was less favorable to employees than the proposal of September 14 previously disapproved by the Council's membership.

During the last day of negotiations, each side presented alternative proposals in the hope of reaching a compromise before the contract expired. The Council proposed that Greyhound continue the old contract for a year or keep it in effect while negotiations continued. Greyhound made a counterproposal to continue the contract until its last offer could be submitted to the Council's membership for a vote. The parties also exchanged proposals to continue the contract while submitting the matter to arbitration. These compromise efforts failed, in part, because the parties could not agree on the issues to be arbitrated.

The parties, however, agreed to extend the contract to 11:59 p.m. Mountain Standard Time on November 2, 1983, in order to accommodate the traveling public. Thereafter, Greyhound unilaterally implemented its October 31 proposal and petitioners went on strike.[1]

On December 3, 1983, Greyhound submitted to the Council a modified written proposal, which was accepted by the Council and ultimately approved by petitioners on December 19. As agreed upon, the modified proposal provided for a wage reduction of 7.8 percent and a total wage and benefit reduction of 14.8 percent. Petitioners returned to work on December 21, 1983.

### III

■ The disqualification imposed by section 1262 is "not contingent upon the merits of the controversy . . . ." (*W. R. Grace & Co.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 720, 731 [151 P.2d 215].) The "section expresses the two-pronged and balanced purpose of the state to maintain its neutrality in trade disputes" and not to use the payment or withholding of benefits to aid either party in that dispute. (*Ruberoid Co.* v. *California Unemployment Ins. Appeals Board* (1963) 59 Cal.2d 73, 77 [27 Cal.Rptr.

---

[1] Although Greyhound had communicated its intent to implement the October 31 offer when the contract expired, the record is unclear whether the wage reduction actually preceded the strike which began at 11:59 p.m., November 2. As appears, our resolution of the present controversy does not turn on this question.

878, 378 P.2d 102]; *Matson Terminals, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 695, 707 [151 P.2d 202].) Although the dynamics and economic realities of the situation leading to unemployment require examination (see *Chrysler Corp.* v. *California Emp. etc. Com.* (1953) 116 Cal.App.2d 8, 15-16 [253 P.2d 68]), the motive or justification underlying the conduct of the involved parties is immaterial. (See *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735, 741, 742 [151 P.2d 224]; *Coast Packing Co.* v. *Cal. Unemp. Ins. Appeals Bd.* (1966) 64 Cal.2d 76 [48 Cal.Rptr. 854, 410 P.2d 358].)

■ Where a trade dispute exists, the courts apply a two-part test to determine ineligibility under section 1262. First, the trade dispute must be a direct or proximate cause of the employee's leaving or remaining away from work. (*Ruberoid, supra,* 59 Cal.2d at pp. 78-79; *Bunny's Waffle Shop* v. *Cal. Emp. Com., supra,* 24 Cal.2d at pp. 740-741; *Mark Hopkins, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 744, 748 [151 P.2d 229, 154 A.L.R. 1081].) Second, the employee must leave or remain away from work voluntarily and not be forced to do so by the act of another. (*Ruberoid, supra,* at pp. 77-78; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 327-328 [109 P.2d 935]; *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239, 242-243 [209 P.2d 602].) When an independent, intervening act of another so disrupts the chain of causation as to render the leaving involuntary, the causation and volitional tests tend to overlap. (See *McKinley, supra,* 34 Cal.2d at pp. 242-243; *Ruberoid, supra,* 59 Cal.2d at p. 82.)

Here, a trade dispute undeniably existed by the time the collective bargaining agreement expired on October 31. Not only had negotiations for a new agreement preceded the expiration of the old one by one and a half months, the negotiations had resulted in seemingly insoluble differences.

■ Petitioners contend that both the disqualifying causational and volitional elements of their leaving work are lacking under the circumstances of this case. They claim Greyhound's unilateral reduction in wages and benefits was such a "drastic" economic weapon that it severed the causal relation between the trade dispute then in existence and their leaving work. In addition, they claim the wage and benefit reduction amounted to a "constructive lockout" which rendered their strike essentially involuntary.

*Causation*

Causation was the dispositive issue in *Bunny's Waffle Shop, supra,* 24 Cal.2d 735. There, employers reduced wages by 25 percent and increased working hours. In response, a number of employees quit but no strike was declared. Although there had been a bona fide labor dispute between

employer representatives and employee unions for several months before the wage reduction and increase in hours, the dispute did not concern these matters. "There was no suggestion during this entire period that wages be reduced or more onerous conditions of work be imposed, or even that the employers wished such changes." (At p. 740.) Instead of being "offered as bona fide proposals for the continued operation of the employers' places of business," the new conditions were "imposed for the sole purpose of coercing the unions into bargaining collectively with the employers' representative . . . ," rather than with each individual employer as before. (*Id.,* at pp. 740-741.) The court held the trade dispute disqualification statute did not apply to deny unemployment compensation because there was no direct causal relation between the dispute and the employees' leaving work. (At pp. 741, 742-743.)

However, in this case Greyhound negotiated with petitioners' union over wage and benefit reductions, and the union resisted them. The dispute over wage reductions was the obstacle which prevented the parties from reaching a new contract. Unlike the wage reductions in *Bunny's Waffle Shop,* these were presented to the Council as essential to the continued operation of Greyhound's business. Unlike the employees in *Bunny's Waffle Shop,* petitioners left work because of an ongoing, unresolved dispute over the terms of the agreement under negotiation, not because of conduct by Greyhound unrelated to an ongoing dispute or negotiations to resolve it.

In the words of the administrative law judge: "The inescapable conclusion from the facts is that the [petitioners] in this matter left because of a trade dispute . . . . The course of the collective bargaining reveals that most of the substantive terms and conditions of employment were actively discussed, argued about, bargained about, and traded off during the weeks and months preceding the expiration of the contract on October 31, 1983. Even from the failure of midterm concessions in 1982, and certainly from the exchange of written proposals in September of 1983, the pattern of slow but steady posturing and counter-posturing of the parties, increasingly more dramatic as the deadline approached, was clearly apparent. The rough outlines of the employer's position were therefore before the membership at the time of the strike vote on October 5, and the council had all but decided to strike when the employer presented a few more restrictions for the first time on October 31. It was unmistakable that the employer was attempting to make a case with the employees for some form of wage and benefits reduction. It was obvious that the [petitioners], particularly with their resounding strike vote, were prepared to have none of it."

Petitioners submit the wage reduction was, as in *Bunny's Waffle Shop,* simply an economic weapon designed to compel compliance with Grey-

hound's demands. Not only does this argument run contrary to the Board's resolution of the facts (see *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 782 [163 Cal.Rptr. 619, 608 P.2d 707]), but it ignores the reasoning in *Bunny's Waffle Shop* that unemployment compensation was available because the particulars of the "economic weapon" used were *unrelated* to the subject of the trade dispute. Use of an economic weapon is not inconsistent with a trade dispute. Here, it was the essence of the dispute—a reduction in wages and benefits.

### Voluntariness

■ Section 1262's "volition" test was first articulated in *Bodinson Mfg. Co.* v. *California E. Com., supra,* 17 Cal.2d 321. In *Bodinson,* the Supreme Court theorized that, "under the proper construction of the statute an employee who is prevented from working through no act of his own is entitled to compensation as, for example, where he is barred by force from the premises where he has been working." (At p. 327.) But employees who refused to pass a picket line of striking employees did so of their own volition. (*Ibid.*) "If the picket line was maintained within the limits permitted by law, as [the one considered] presumably was, no physical compulsion was exerted to prevent [the employees] from working. They were unemployed solely because, in accordance with their union principles, they did not choose to work in a plant where certain of their fellow employees were on strike." (At pp. 327-328.)

Subsequent cases make clear the "ultimate act" (i.e., lockout or strike) which produces the cessation of employment is not necessarily the determinative factor. (*McKinley, supra,* 34 Cal.2d at p. 243.) Even if there is a lockout barring employment, the leaving may nonetheless be voluntary if it is attributable to and a foreseeable consequence of the employees' own action. ■ Thus, for example, where union employees vote for and call a strike against one employer in an employers' bargaining group with the knowledge the other employers will shut down their plants in response, all the union employees who are affected by the shutdowns as well as those who participated in the strike are disqualified from receiving unemployment compensation. (*McKinley, supra,* 34 Cal.2d at pp. 244-245; see *Gardner* v. *State of California* (1959) 53 Cal.2d 23, 27-30 [346 P.2d 193].)

■ Conversely, where an employer closes his plant because the employees' union refused, during preliminary negotiations for a new contract, to give assurance the employer would have enough time to clear perishables prior to any strike, the resulting unemployment is involuntary. (*Coast Packing, supra,* 64 Cal.2d at pp. 78-80.) Said the Supreme Court in *Coast Packing*: "If we were to conclude that the unarticulated threat of economic

coercion is a sufficient volitional act to disqualify an employee when his employer ceases operations rather than continue under a claimed threat, what action on the part of the union can be deemed to constitute such threat? Certainly it cannot be the mere association of employees for collective bargaining purposes. Nor can the further circumstance that negotiations are under way and the union has rejected employer proposals for ground rules during negotiations require disqualification." (At p. 80.)[2] Although the employer's shutdown appeared to be a "prudent act and economically justified, the statutory scheme for unemployment compensation benefits does not take these matters into consideration . . . ." (*Ibid.*)

 The record here strongly supports the inference that petitioners went on strike because they chose to do so in order to enforce their bargaining demands. While Greyhound's implementation of the wage reduction was a form of economic weapon, it also was central to the employer's position in ongoing negotiations at the bargaining table. Since petitioners implacably refused to have anything to do with Greyhound's wage reduction proposal, and indeed crystalized that position by their overwhelming vote to strike, it is immaterial whether Greyhound first reduced wages or petitioners first struck. By October 31, 1983, the parties' respective positions had been clearly drawn, and the responses of each to the initiatives of the other were predictable and foreseeable. Petitioners were not actually prevented from working; they went on strike. Moreover, there was a palpable connection between petitioners' decision to authorize a strike and the strike which ensued.

Petitioners argue the wage reduction constituted a "constructive lockout" and therefore made their unemployment involuntary as a matter of law. This theory is not supported by the decisional law. The form of cessation of employment is not controlling; what matters is what precedes it in terms of causation and volitional conduct. (*McKinley, supra,* 34 Cal.2d at p. 243.) Petitioners nevertheless point out the administrative arbiter in *Bunny's Waffle Shop* awarded benefits on the ground the 25 percent cut in wages was "tantamount to a lockout." (*Supra,* 24 Cal.2d at pp. 738-739.) However, the reviewing court did not embrace that analysis but instead affirmed the award because direct causation was lacking. Petitioners also rely on dictum in *McKinley* that, in *Bunny's Waffle Shop,* "the unemployment was due to a lockout; . . ." (*Supra,* 34 Cal.2d at pp. 244-245.) At most, this dictum stands for the principle that a wage reduction could create a lockout situation independently causing unemployment if the reduction was not the subject of a trade dispute.

---

[2] In reality, there was no trade dispute in *Coast Packing* prior to the employer's lockout. (See Annot., General Principles Pertaining to Statutory Disqualification for Unemployment Compensation Benefits Because of Strike or Labor Dispute (1975) 63 A.L.R.3d 88, 107-112.)

Petitioners rely on a statement in *Gardner* v. *State of California* that the *volitional test* should be enforced "against the party who strikes the first blow with the drastic economic weapon of strike or lockout." (*Supra,* 53 Cal.2d at p. 29.) We do not believe the *Gardner* court meant by this statement to place form over substance. In any event, the statement does not by its terms embrace a "constructive" lockout. The "first blow" about which the *Gardner* court speaks is a real lockout, making it physically impossible for the employees to work. The case stands at most for the principle that, if the employees strike before a lockout, they are ineligible for unemployment compensation. And if the employer locks the employees out before the strike, the employees are not ineligible by reason of section 1262.

Petitioners must look to other jurisdictions to support their theory of a constructive lockout. In so doing, they urge this court to read a "good cause" or alternatively a "status quo" standard into section 1262 where none exists.

Petitioners rely on *Sunstar Foods, Inc.* v. *Uhlendorf* (Minn. 1981) 310 N.W.2d 80. In *Sunstar,* the Supreme Court of Minnesota held that an employer's unilateral imposition of a negotiation proposal which reduced wages by 21 percent to 26 percent was so unreasonably onerous as to justify a factual determination of a lockout. Before arriving at this conclusion, the court surveyed cases in other jurisdictions (including *Bunny's Waffle Shop*) which had addressed the issue whether wage reductions were "good cause" for voluntarily terminating employment. (310 N.W.2d at p. 84.) Following *Sunstar,* the Minnesota Commissioner of Economic Security found Greyhound's employees in Minnesota eligible for benefits during the November-December 1983 work stoppage.

Petitioners' reliance on *Sunstar* is misplaced. *Bunny's Waffle Shop* did not engraft a "good cause" exception onto section 1262. Rather the court first found the employees did not leave work *because of* a trade dispute. Only then did the court consider the application of section 1256, the general provision which disqualifies from unemployment benefits an employee who leaves work "voluntarily without good cause." Under section 1256, the court upheld the administrative finding that a 25 percent wage cut was "good cause" for leaving employment. (*Supra,* 24 Cal.2d at p. 743.) The court made clear, however, that had the employees "left their work because of the trade dispute, the merits of the controversy would be immaterial and there would be no occasion to inquire whether they had good cause for leaving." (*Id.,* at pp. 742-743, citing *W. R. Grace, supra,* 24 Cal.2d 720.)[3]

---

[3] Petitioners are not without recourse. The National Labor Relations Act (NLRA) proscribes as an unfair labor practice an employer's refusal to bargain in good faith with the collective bargaining representative of its employees. (§ 8(a)(5) and (d), codified at 29 U.S.C.

Section 1256, which expressly incorporates a "good cause" standard, has nothing to do with trade disputes. If the Legislature had wished to incorporate a good cause standard into section 1262, it could have done so. Judicial engrafting of such a standard where none is expressed would conflict with California's policy of neutrality in the trade dispute arena. If the right to benefits under section 1262 depended on the fairness of a wage reduction, then the state inevitably would become embroiled in the merits of the dispute.

Furthermore, section 1262 does not track the language of the statute involved in *Sunstar*. The Minnesota statute specifically excepts lockouts from disqualifying labor disputes (Minn. Stat. § 268.09, subd. 3), whereas 1262 does not. ■ As illustrated by the California cases previously discussed, a lockout situation does not necessarily preclude a finding of voluntary unemployment. Simply put, "involuntariness" is not the equivalent of "good cause."

■ For similar reasons we reject the so-called "status quo" standard. In *Erie Forge & S. Corp.* v. *Unemployment Comp. Bd. of Rev.* (1960) 400 Pa. 440 [163 A.2d 91], employees were willing to work under the terms of a preexisting contract but the employer refused to extend the agreement to avert a work stoppage pending the final settlement of contract negotiations. Because the employer refused to maintain the status quo and instead imposed less favorable conditions, the Supreme Court of Pennsylvania held the resulting work stoppage constituted a lockout and the employees were not disqualified from receiving unemployment compensation. (163 A.2d at pp. 93-94.)[4] As the status quo standard goes far beyond the good cause standard articulated in *Sunstar*, it constitutes an even greater departure from the legislative policy favoring neutrality. Such a standard would have the effect of empowering employees effectively to extend unilaterally the terms of a contract beyond its agreed upon termination date. The employer suffering economic difficulties would be faced with a dilemma: either continue the terms of the expired contract or subsidize a strike against itself. (*Accord, D. J. B. Collieries Co.* v. *Kentucky Unemp. Ins. Com'n* (Ky.App. 1964) 385 S.W.2d 772, 775.)

---

§ 158(a)(5) and (d).) If Greyhound were insincere in tendering the wage reduction as a genuine proposal for the continued operation of the business, it would be guilty of an unfair labor practice (see *Labor Board* v. *Truitt Mfg. Co.* (1956) 351 U.S. 149, 152-154 [100 L.Ed. 1027, 1032, 76 S.Ct. 753]; *N.L.R.B.* v. *Arkansas Rice Growers Cooperative Ass'n* (8th Cir. 1968) 400 F.2d 565, 571), for which there are remedies under the NLRA.

[4] The Pennsylvania statute is similar to the one in Minnesota. (See *Erie Forge, supra,* 163 A.2d at p. 93, fn. 1; see also Annot., Unemployment Compensation: Application of Labor Dispute Disqualification for Benefits to Locked Out Employee (1975) 62 A.L.R.3d 437, 452-483, for other jurisdictions which expressly except lockouts.)

## IV

As their argument of last resort, petitioners claim the trade dispute disqualification of section 1262 unconstitutionally discriminates against them because they joined together in a work stoppage. Had they not done so and individually quit work because of the reduction in their wages and benefits, there would have been "good cause" for leaving work under section 1256.

The statute does indeed distinguish the two situations, but on a rational basis. In *Ohio Bureau of Employment Serv.* v. *Hodory* (1977) 431 U.S. 471, 489-493 [52 L.Ed.2d 513, 527-530, 97 S.Ct. 1898], the United States Supreme Court found no equal protection violation under an Ohio statute imposing a disqualification for benefits when unemployment was "due to a labor dispute." The Ohio statute had a rational relation to legitimate state interests in providing protection for employers, in assisting in the settlement of labor disputes, and in protecting the fiscal integrity of the state's compensation fund. (*Ibid.*) California shares all these interests and another—not to interfere with the free play of economic forces during the bargaining process. In the present situation, the different treatment is not arbitrary. In fact, an employee who strikes and an employee who quits are not similarly situated: one is applying leverage to gain advantages from his employer while the other has totally severed the employment relationship.

In a related vein, petitioners assert the trade dispute disqualification as applied to them impermissibly interferes with the exercise of their associational rights under section 7 of the NLRA (29 U.S.C. § 157) to engage in concerted activity for the purpose of collective bargaining. The Supreme Court's recent decision in *Baker* v. *General Motors Corp.* (1986) 478 U.S. 621 [92 L.Ed.2d 504, 106 S.Ct. 3129] dispenses with the preemption argument.

Unquestionably, federal labor law protects the employees' right to unionize and to strike. *Baker,* however, makes equally clear that no federal law divests the states of the power to make the policy choice between paying or denying unemployment compensation to strikers, so long as the unemployment is a foreseeable consequence of the exercise of their section seven rights. (478 U.S.at pp. 632-638 [92 L.Ed.2d at pp. 515-519]; see also *New York Tel. Co.* v. *New York Labor Dept.* (1979) 440 U.S. 519, 540-546 [59 L.Ed.2d 553, 568-572, 99 S.Ct. 1328].) As explained in *New York Tel. Co.* (440 U.S. at p. 544 [59 L.Ed.2d at p. 571]) and reiterated in *Baker* (478 U.S. at pp. 633-634 [92 L.Ed.2d at p. 516]): "Undeniably, Congress was aware of the possible impact of unemployment compensation on the bargaining process. The omission of any direction concerning payment to strikers in either

the National Labor Relations Act or the Social Security Act implies that Congress intended that the States be free to authorize, or to prohibit, such payments."

In *Baker,* the Supreme Court found no federal preemption where a Michigan statute disqualified employees for unemployment compensation if they "financed" a strike causing their unemployment. ■ Although contributing to a fund which will strengthen the union's bargaining position and expending money to support a strike are arguably protected rights under section 7 of the NLRA, nonetheless the decision to participate in a strike by financing it is a voluntary undertaking which "cause[s] one's own unemployment." (478 U.S. at pp. 637-638 [92 L.Ed.2d at pp. 518-519].)

■ To be distinguished is the involuntary situation where the employer engages in conduct forbidden under the NLRA which intervenes to sever the causal connection. For example, an employee's decision to file an unfair labor practice against her employer which motivates the employer to discharge her in retaliation cannot be treated as a voluntary decision to cause her own unemployment so as to disqualify her from unemployment compensation. (See *Nash* v. *Florida Industrial Com.* (1967) 389 U.S. 235 [19 L.Ed.2d 438 [19 L.Ed.2d 438, 88 S.Ct. 362]] as discussed in *Baker, supra,* 478 U.S. at pp. 635-636 [92 L.Ed.2d at pp. 517-519].) ■ Said the Supreme Court in *Nash*: "We have no doubt that coercive actions which the Act forbids employers and unions to take against persons making charges are likewise prohibited from being taken by the States." (389 U.S. at p. 239 ⟨ [19 L.Ed.2d at p. 442].)

■■ Petitioners place primary reliance on *United Steel Workers of America* v. *Meierhenry* (S.D. 1985) 608 F.Supp. 201 [aff. 799 F.2d 402, affd. on rehg. 830 F.2d 924.] *Meierhenry,* however, predated *Baker* and is inapposite to petitioners' situation. *Meierhenry* considered a South Dakota trade dispute disqualification statute which, as applied, discriminated between union strikers and nonunion employees of the same grade and class who were locked out as a result of the union strike. Because of the statute's "specialized application to union versus non-union workers unemployed by a strike," only persons in the former group were disqualified from receiving benefits. "Inherently destructive" and "in direct conflict with" the right to unionize, the statute was held to be preempted by the NLRA. (608 F.Supp. at pp. 205-208.)

Unlike the South Dakota statute in *Meierhenry,* California's trade dispute disqualification is neutral. It applies to employees who strike voluntarily because of a trade dispute irrespective of union affiliation, and it does not favor either party to the dispute. Once the parties reached impasse during

negotiations, there was nothing unlawful in Greyhound's unilaterally changing the terms and conditions of employment consistent with its final offer which the union rejected. (Cf. *N.L.R.B.* v. *Katz* (1962) 369 U.S. 736, 745, fn. 12 [8 L.Ed. 2d 230, 237, 82 S.Ct. 1107]; *American Fed. of Television & Radio Artists* v. *N.L.R.B.* (D.C. Cir. 1968) 395 F.2d 622, 624 [129 App.D.C. 399]; 1 Morris, The Developing Labor Law (1983) pp. 634-636.) Hence, petitioners' ineligibility for benefits under section 1262 is in conflict with neither the federal nor state guaranteed rights to organize and engage in concerted activity for the purpose of collective bargaining (see Lab. Code, § 923).

We conclude there is no legal reason to disturb the Board's exercise of discretion in applying Unemployment Insurance Code section 1262 to the circumstances of this case. The petition for a peremptory writ of mandate is denied. The alternative writ, having served its purpose, is discharged.

Evans, J., and Sims, J., concurred.

Petitioner's application for review by the Supreme Court was denied June 1, 1989. Mosk, J., and Broussard, J., were of the opinion that the application should be granted.